DECISION
The dissolution petition relating to the partnership of Anderson, Zangari Bossian (AZB) was tried to the Court over the course of numerous days beginning in November 2002 and concluding in April 2003. Thereafter, proposed findings of fact and memoranda were submitted. AZB consists of three partners: Paul Anderson ("Anderson"), Carol Zangari ("Zangari"), and Dennis Bossian ("Bossian"). The dissolving partners agree on two basic facts, namely that the partnership be dissolved and that the dissolution be effective August 31, 1999. All remaining significant facts relevant to the conclusion of this matter are marked by considerable discord which regrettably defined the partnership's existence in its waning months. Partners Anderson and Bossian are diametrically opposed on most issues germane to the dissolution of the partnership, while partner Zangari can be found often in the middle, but largely agreeing with Anderson as to the essential terms of the partnership agreement. For the purpose of analyzing and resolving this conflict, the Court will undertake the following review: (1) predecessor firm history, (2) formatted AZB partnership theory advanced by Anderson and acknowledged in material respects by Zangari, along with certain fee accounting, and (3) juxtaposed partnership theories advanced by Bossian.
 PREDECESSOR FIRM HISTROY
Anderson was admitted to the Rhode Island Bar in 1971. Soon thereafter, he worked as an associate with his father and later became a partner, the resulting firm being known as Anderson and Anderson ("AA"). His father's long time friend and accountant, Herbert E. Harris, Jr., Esq. ("Harris"), assisted in implementing the financial arrangements regarding AA. All agreements were oral. Zangari joined AA as an associate in January 1979. By the mid 1980s Charles H. Anderson withdrew from the active practice of law and a new partnership was formed between Anderson and Zangari ("AZ"), the two parties becoming 60/40 partners respectively and Charles H. Anderson continuing as an affiliated independent practitioner. Harris assisted again in crafting the financial arrangements. In order to finance ongoing business operations the new firm of AZ utilized all the monies that were collected subsequent to January 1, 1986 attributable to legal work both before and after January 1, 1986. Monthly records were kept by Sharyn Rock, Patricia Eason and other office personnel differentiating revenues attributable to services rendered by AA and revenues attributable to services rendered by AZ. AZ also agreed to purchase furnishings and equipment from the predecessor firm AA for a stated sum. The furniture and equipment debt was to be retired by AZ in the form of monthly payments and pre-1986 "accounts receivable," so-called, to the predecessor firm of AA was to be retired as the cash flow and resources of the new firm of AZ permitted. It was also agreed that the sums due to Charles H. Anderson were to be addressed and retired more aggressively than those due to Anderson. All these agreements were oral.
In January 1988 Dennis D. Bossian ("Bossian") was hired as an associate by the firm of AZ. At that time he was given a base salary and a certain percentage of fees he collected from private clients as adjusted through an agreed formulation. All agreements between AZ and Bossian were oral.
AZ reached its maximum size in the early 90's at which point there were six or seven associates practicing with the two partners. In 1993, however, the amount of work the firm was receiving from its principal insurance carrier client, Allstate, sharply decreased as a result of an increased emphasis by Allstate on staff counsel and a substantial expansion in the number of firms that were authorized to handle what was referred to as "outside" defense work. As a result of the substantial decrease in the amount of files referred from Allstate, and a contemporaneous reduction in Workers' Compensation defense work brought about by statutory modifications, the firm initiated staff reductions. By early 1994 the firm consisted of only the two partners and two associates, one of whom was Bossian. A restructuring of the firm ultimately resulted with the formation of AZB on January 1, 1995.
 AZB FORMATTED PARTNERSHIP
The present controversy centers around what, if any, partnership agreement existed between the partners. Before turning to Bossian's assertions in that regard, it would be helpful to understand Anderson's view of the partnership agreement which is largely substantiated by Zangari, although she is clear in noting that she would not attempt to ascribe to Bossian what understanding he might have had with respect to the same.
The Anderson/Zangari view of the partnership may be summarized as follows. That view of the partnership shall be referred to as the "AZB Formatted Partnership".
(1) Anderson would receive a gross draw of $2,000 per week, or $104,000 per year. Zangari would receive a gross draw of $1,750 per week, or $91,000 per year. Bossian would receive a gross draw of $1,250 per week, or $65,000 per year. The expenses incurred by the new firm would be divided equally among the three partners. A computation would then be made in which the three gross draws of $260,000 would be added to the overhead, which was estimated to be in the area of $300,000-$350,000, to arrive at a gross figure called the "partnership nut." The partnership nut would then be divided by three to arrive at the "individual partner's nut." It was further agreed that after all expenses had been paid, and the three agreed upon base draws had been paid that any partner who generated sums in excess of his or her "partner's nut" would be entitled to 50% of the excess and the remining 50% would be divided in accordance with a 40/35/25 ratio to Anderson, Zangari, and Bossian respectively. As a result, once sufficient gross revenues were generated to cover all expenses and draws, if Anderson had generated in excess of the "partner's nut" he would be entitled to receive 70% of the excess, Zangari entitled to 17.5% of Anderson's excess, and Bossian to 12.5% of Anderson's excess. Similarly, if Zangari exceeded the "partner's nut" she would be entitled to receive 67.5% of the excess, Anderson entitled to 20% of her excess, and Bossian entitled to 12.5% of her excess. Continuing, if Bossian exceeded the "partner's nut" he would be entitled to receive 62.5% of the excess, Anderson entitled to 20% of Bossian's excess, and Zangari entitled to 17.5% of Bossian's excess. This formulation was designed to reflect the respective talents, seniority and experience of each attorney.
(2) In an effort to give each partner a relatively equal opportunity to succeed it was agreed that the insurance company work would be distributed by the office manager, Patricia Eason. She would assign the defense files on a rotating basis so as to insure that each of the three partners had a comparable number of pending insurance defense files to handle. Because of the natural dynamic that existed between private clients and the respective attorneys, each attorney would continue to assume responsibility for his or her own clients.
(3) The specific arrangements relative to the necessary record keeping were discussed with staff personnel, Patricia Eason and Sharyn Rock. They had been through this process before during the transfer of ownership from AA to AZ. With the beginning of the new partnership in January 1995, detailed monthly records were kept in the same fashion that they were kept during the prior transition. They differentiated the monies collected, whether in the form of fees or reimbursed expenses, as being "AZ money" or "AZB money". In early January 1995 the balances in the various AZ accounts were transferred into parallel AZB accounts. A format was devised by Zangari to allow the necessary calculation to be made by Bossian as his pending private cases began to resolve. While both Anderson and Zangari were also required to make similar allocations of their "private client" fees between pre-1995 work and post-1995 work, like Bossian's allocation, those were based on a subjective assessment of the respective amount of work and time performed with AA as opposed to AZ.
(4) Other than Bossian's private cases, the first fee significant enough to be considered unusual was received by AZB in June 1995. It resulted from a medical malpractice case (the "Miller fee") handled by Zangari. This fee resulted in an appropriate allocation between AZ and AZB. After that allocation calendar years 95 through 97 were below average resulting in insufficient income to justify distribution much beyond the agreed upon draws.
(5) The next financial development of consequence was the resolution of the "Lehane" subrogation suit that was tried resulting in a verdict favorable to Allstate. Allstate had elected to pursue that subrogation suit under a contingency arrangement with Anderson as opposed to the customary hourly fee arrangement. He had handled the case since its inception. After appeal the matter was settled which resulted in payment of a legal fee of approximately $665,000. Upon receipt of that fee a process was undertaken to bring the respective accounts of the three partners up to date and extinquish the AZB obligation to AZ for the AZ funds that had been utilized for start-up and operating costs of the AZB law firm from January 1, 1995 through December 31, 1997. Those calculations, although initially prepared by Anderson from the monthly accounting figures that had been distributed by Sharyn Rock and Patricia Eason to the three partners since the inception of AZB, were reviewed by Harris who concurred with the methodology of the approach. On March 25, 1998 the so-called "Lehane" accounting was presented to Zangari and Bossian. The Court is satisfied that the accounting prepared by Anderson is accurate under the formatted partnership theory that he advocates.
(6) The "Lehane" accounting was designed to eliminate all pre AZB "accounts receivable," so-called, that would be distributed to Anderson and Zangari. As a result Anderson proposed that the existing 40/35/25 formula be modified to a 1/3-1/3-1/3 formula with equal draws of $1,500 per week, or $78,000 per year for each partner. The expenses again would be shared equally among the three partners and the application of the "new formula" would be applied to any revenue in excess of the "partner's nut." As a result, under the post-Lehane modification Bossian received an annual draw increase of $13,000 ($65,000 to $78,000), Zangari received a draw reduction of $13,000 ($91,000 to $78,000) and Anderson received a draw reduction of $26,000 ($104,000 to $78,000). This arrangement was intended to put all the partners on an equal footing post-Lehane and to reduce the aggregate partners' draws from $260,000 to $234,000, thus making the "partnership nut" and the respective "partner's nut" lower and triggering the excess benefit distribution earlier for each of the three partners involved. None of the partners expressed any disagreement with or raised any question about the March 25, 1998 "Lehane" accounting until it became the subject of litigation initiated by Bossian against Anderson in March 1999, one year later. By that time quarterly taxes had been paid, monies had been expended and/or otherwise committed. As further evidence of the agreements that were reached, computations of sums earned by the respective attorneys and application of the new formula was done by Zangari for calendar year 1998 and up to and including June 30, 1999 when the partners went their separate ways. During that period monies were distributed to the three partners and taxes were paid on all distributions.
 ARGUMENTS JUXTAPOSED TO AZB FORMATTED PARTNERSHIP
Bossian asserts that there never was an oral partnership agreement and lacking such an agreement that the partnership tax returns are binding on the partners as stating what the partnership agreement is. He therefore argues that the K-1s, which state his partnership interest as 25% of assets and liabilities, evidences his partnership interest as well, independent of any format as advanced by Anderson. The Court rejects this contention for a multitude of reasons.
First, this contention is contrary to the history of the firms. The firms have had a history of oral agreement embodying the "formatted partnership" arrangement. That fact is readily apparent during both the AA and AZ partnership periods. It is perfectly reasonable to infer that the AZB partnership was similarly established. A similar type of oral agreement also existed with respect to Bossian's compensation as an associate during the AZ years. If for some reason Bossian did not fully understand the specifics of the oral partnership agreement, that misunderstanding would seemingly arise from his failure to inquire as to such specifics during the AZB's four and one-half year existence. By his own admission Bossian never sought specific information from either partner or Harris. Rather, he describes the euphoria he felt upon being invited to join Anderson and Zangari in partnership and his lack of interest in the financial details of said partnership. He also failed to raise any questions as it would relate to the financial aspects of AZB during significant accounting periods — "Miller" and "Lehane" as previously discussed. It is implausible that Bossian was not aware of the "Miller" accounting given the accolades he heaped upon Zangari upon the resolution of that case. Furthermore, based on the testimony of Ms. Eason, it is more likely than not that he was fully apprised of the "Lehane" accounting. Accordingly, the Court believes that Bossian either expressly assented to the AZB Formatted Partnership or impliedly did so by his conduct over the years.
If the Court were to find that no such agreement existed as Bossian advocates, the Court would not be able to fashion a more equitable basis for distribution than called for under the AZB Formatted Partnership. Bossian's assertion that the Court should simply follow that stated capital figure on the income tax returns makes no sense. If the Court were to accept that the theory, one would have to conclude that Anderson and Zangari intended to gift a substantial amount of partnership assets of AZ to AZB, whether assets existing at the time of AZB's formation or for fees that may later be collected for work performed during the AZ period. Such a conclusion defies logic.
Bossian all asserts that the income tax returns are fraudulent. The stated capital percentages on the returns undoubtedly reflect the respective draws of the individual partners. That presentation may erroneously state a capital position, but it hardly constitutes fraud or the basis of a partnership agreement when the overwhelming evidence leads this Court to a contrary conclusion. The court is not charged with the task of determining the returns' compliance with applicable tax code. That notwithstanding, there is no evidence of tax fraud that would impact the Court's task of dissolving AZB. Similar assertions with respect to "off the book" accounting, obstruction of justice, insider dealings, money laundering, and other general fraudulent behavior lack any evidentiary basis.
Sadly, it was necessary that the story of AZB's demise be told in Court following numerous unsuccessful attempts to mediate a solution. Tales of distrust and deceit replaced what in earlier years would have been statements of respect and affection. It is now time for each of the unhappy former partners to put this matter aside and to use his or her respective considerable talents and skill for doing what each has been trained to do — providing counsel to clients in need — rather than participating in an endless maze of pro se litigation.
 CONCLUSION
The court makes the following findings:
(1) AZB is dissolved as of August 31, 1999.
(2) No indebtedness exists on the part of AZB or its individual partners to any third party.
(3) No evidence exists that any partners has defrauded one another and/or any third party.
(4) Each of the partners expressly agreed to the AZB Formatted Partnership. Furthermore, all such parties should be held to such agreement because of their conduct in acquiescence to the same.
(5) Assuming arguendo that no such agreement could be found to exist — either expressly or impliedly — equity dictates that the dissolution of said partnership be made in accordance with said AZB Formatted Partnership.
Consistent with these findings, the parties are directed within thirty (30) days to submit to this Court and order setting forth the distribution to be made to each partner of those remaining partnership funds being held in escrow, which approximate $55,000. In the event said parties cannot agree on such an order, the Court will employ a special Accounting Master to prepare the same, the expense of which shall be borne equally by the parties. After preparation of said order, the Court shall enter the same along with an appropriate Judgment in this matter.